■ In the Matter of JULES S. CZERMANN JR. et al., Petitioners, v NEW YORK STATE RACING AND WAGERING BOARD, Respondent. (Proceeding No. 1.) In the Matter of TIMOTHY CASE, Petitioner, v NEW YORK STATE RACING AND WAGERING BOARD, Respondent. (Proceeding No. 2.) In the Matter of ROBERT SUMNER, Petitioner, v NEW YORK STATE RACING AND WAGERING BOARD, Respondent. (Proceeding No. 3.) [891 NYS2d 721]—

Rose, J.

Random blood samples from horses trained by petitioners showed levels of total carbon dioxide (hereinafter TCO2) in excess of those allowed by the pertinent New York regulation (*see* 9 NYCRR 4120.13 [a]).[1] Following hearings on the resulting charges, respondent found that each petitioner had violated the regulation and that petitioner Keith J. Kash Jr. had also tampered with the "guarded quarantine" process, an optional means of establishing a defense to the TCO2 charge (*see* 9 NYCRR 4120.13 [b]).[2] In addition to imposing fines ranging from $1,000 to $5,000, respondent suspended Kash's license for one year, revoked the licenses of two petitioners for at least five years and suspended the licenses of the remaining petitioners for 60 days. These CPLR article 78 proceedings ensued and were transferred to this Court.

The "trainer's responsibility rule" places strict responsibility upon trainers to ensure that horses in their care do not receive prohibited substances within specified time periods before a race (*see* 9 NYCRR 4120.4; *Matter of Mosher v New York State Racing & Wagering Bd.*, 74 NY2d 688, 690 [1989]; *Matter of Casse v New York State Racing & Wagering Bd.*, 70 NY2d 589, 594 [1987]). The rule creates a rebuttable presumption of trainer liability when a horse tests positive. Here, petitioners concede that they were the licensed trainers of the horses at issue, but challenge the reliability of the TCO2 testing equipment and the validity of the test results for their horses.

Although petitioners argue that there is insufficient evidence establishing the reliability of the TCO2 testing scheme that resulted in the charges against them, the record contains extensive testimony on that issue by George Maylin, an associate professor of toxicology and director of respondent's equine drug testing and research program at Cornell University. Maylin testified that the equipment used to test the blood of petitioners' horses is widely accepted and a reliable method of determining TCO2 levels. As for the test results for petitioners' horses, Maylin testified that, to a reasonable degree of scientific certainty, the testing equipment was functioning properly, the results were accurate and they violated the TCO2 regulation. In an attempt to challenge that proof, petitioner presented the conflicting expert testimony of Jonathan Foreman, a professor

---

1. TCO2 testing measures the total carbon dioxide level in a racehorse's blood. In New York and several other states, excessive TCO2 levels are recognized as indicating that an alkalizing agent, commonly referred to as a "milkshake," was administered to the horse in order to improve its performance.

2. The guarded quarantine process is used to ascertain whether the tested TCO2 level is physiologically normal for that horse.

of equine internal medicine at the University of Illinois. Foreman opined that the testing equipment used here is not an appropriate means of measuring TCO2 in horses because it is designed to test human blood and cannot be properly calibrated for the higher levels found in equine blood. Petitioners also contend that Maylin's own testimony demonstrates that there are imprecisions in the testing standards and equipment that call their reliability into question. In addition, petitioners argue that because Maylin stated that blood samples for TCO2 testing should not be drawn less than three hours after a horse has been administered Lasix,[3] the test results based upon blood drawn from one petitioner's horse at two hours and 58 minutes should have been disregarded as inaccurate. Maylin also opined, however, that his concerns about accuracy would be minimal in that case because any effect of Lasix after $2^{1}/_{2}$ hours would not be enough to raise the TCO2 level above the permitted limit. Given the conflicting expert opinions as to this and other testing issues, respondent did not abuse its discretion in crediting Maylin's opinions over those of Foreman and accepting the TCO2 test results as accurate (*see Matter of Pletcher v New York State Racing & Wagering Bd.*, 35 AD3d 920, 922 [2006], *lv denied* 9 NY3d 802 [2007]; *Matter of Dutrow v New York State Racing & Wagering Bd.*, 18 AD3d 947, 948 [2005]).

Respondent also properly disregarded petitioners' alternative theories as to how the horses' TCO2 levels could have been elevated without an alkalizing agent being used, since "[s]peculation will not rebut the presumption" of trainer responsibility (*Matter of Zito v New York State Racing & Wagering Bd.*, 300 AD2d 805, 807 [2002], *lv denied* 100 NY2d 502 [2003]). Thus, there is substantial evidence of properly obtained positive TCO2 tests, which petitioners failed to rebut, and we find respondent's determination that petitioners violated the TCO2 regulation to be adequately supported by the record (*see Matter of Mosher v New York State Racing & Wagering Bd.*, 74 NY2d at 690; *Matter of Case v New York State Racing & Wagering Bd.*, 61 AD3d 1313, 1314 [2009], *lv denied* 13 NY3d 705 [2009]; *Matter of Zito v New York State Racing & Wagering Bd.*, 300 AD2d at 806-807).

Similarly, as to the second charge against Kash, we find substantial evidence of his tampering in the witness testimony that he had supplied his horse with water mixed with bleach in an attempt to raise the horse's "normal" TCO2 level during the guarded quarantine. To the extent that petitioners also contend that the TCO2 regulation itself is flawed and serves no legiti-

---

3. Lasix is a permitted, therapeutic alkalizing agent.

mate governmental purpose, they raise an untimely challenge to its validity (*see* CPLR 217 [1]).

Finally, petitioners' challenge to the severity of the penalties imposed is also unavailing. Under the circumstances of the proven violations, the suspensions and revocations of their licenses are not "so disproportionate to the offense as to be shocking to one's sense of fairness" (*Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County*, 34 NY2d 222, 237 [1974]; *see Matter of Case v New York State Racing & Wagering Bd.*, 61 AD3d at 1314).

Kavanagh, Stein, McCarthy and Garry, JJ., concur. Adjudged that the determinations are confirmed, without costs, and petitions dismissed.

